UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

v.

TAKATA CORPORATION,

Defendant.

Case No. 16-20810

Honorable George Caram Steeh

Offense:   Wire Fraud

Violation:   18 U.S.C. § 1343

Statutory Maximum Period of Probation:
18 U.S.C. § 3561(c) (five years)

Statutory Minimum Period of Probation:
18 U.S.C. § 3561(c) (one year)

Statutory Maximum Fine: 18 U.S.C.
§ 3571(d) (the greater of twice the gross
gain or twice the gross loss)

Statutory Minimum Fine:
None/Not Applicable

# Rule 11 Plea Agreement

The United States of America, by and through the Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District of Michigan (collectively, the "Offices"), and the Defendant, Takata Corporation (the "Defendant"), by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Board of Directors, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and conditions of this Agreement are as follows:

1.   **Guilty Plea**

   A.   **Waiver of Indictment and Venue**

   Pursuant to Fed. R. Crim. P. 7(b), the Defendant agrees to knowingly waive its right to grand jury indictment and its right to challenge venue in the United States District Court for the Eastern District of Michigan, and to plead guilty to the First Superseding Information (the "Information").

   B.   **Count of Conviction**

   The Information charges one count: wire fraud in violation of 18 U.S.C. §

2

1343. The Defendant agrees to persist in a guilty plea to that charge and, as set forth below, to cooperate fully with the Offices in their investigation into the conduct described in this Agreement.

## C.    Elements of Offense

The elements of wire fraud are as follows:

(1)    The defendant knowingly participated in, devised, or intended to devise a scheme to defraud in order to obtain money or property;

(2)    The scheme included a material misrepresentation or concealment of a material fact;

(3)    The defendant had the intent to defraud;

(4)    The defendant used (or caused another to use) wire, radio or television communications in interstate or foreign commerce in furtherance of the scheme;

(5)    Each element listed above was committed by one or more of the defendant's employees or agents;

(6)    The employee or agent was acting, at least in part, to benefit the defendant; and

(7)    The employee or agent was acting within the course and scope

3

of the employee's or agent's employment.

**D.      Statutory Maximum Penalty**

The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1343  is a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Code, Section 3571(c), (d); five years' probation, Title 18, United States Code, Section 3561(c)(1); a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B); and restitution under Title 18, United States Code, Section 3663A, as applicable.

**E.      Factual Basis for Guilty Plea**

The Defendant is pleading guilty because it is guilty of the charge contained in the Information.  The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and Attachment B are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and Attachment B, and that the Information and Attachment B accurately reflect the Defendant's criminal conduct and intent.

**2.      Sentencing Guidelines**

**A.      Standard of Proof**

The Court will find sentencing factors by a preponderance of the evidence.

4

### B.    Agreed Guideline Range

There are no sentencing guideline disputes.  The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines.  The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a).  The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof.  The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 3.  The Offices and the Defendant agree that a faithful application of the United States Sentencing Guidelines (U.S.S.G.) to determine the applicable fine range yields the following analysis:

     a.    The 2016 U.S.S.G. are applicable to this matter.

     b.    Offense Level.  Based upon U.S.S.G. § 2B1.1, the total offense level is 41, calculated as follows:

| | | |
|---|---|---|
| (a)(1) | Base Offense Level | 7 |
| (b)(1) | Amount of Loss/Gain | +28 |
| (b)(2)(A) | Involved 10 or More Victims | +2 |

| (b)(10) | Substantial Part of Scheme Committed from Outside the United States/Involved Sophisticated Means | +2 |
|---|---|---|
| (b)(15) | Reckless Risk of Death or Serious Injury | +2 |
| **TOTAL** | | **41** |

c.   <u>Base Fine</u>. Based upon U.S.S.G. § 8C2.4(a), the base fine is $481,848,850 (the pecuniary gain from the offense)

d.   <u>Culpability Score</u>. Based upon U.S.S.G. § 8C2.5, the culpability score is 8, calculated as follows:

| (a) | Base Culpability Score | 5 |
|---|---|---|
| (b)(1) | the unit of the organization within which the offense was committed had 5,000 or more employees and an individual within high-level personnel of the unit participated in, condoned, or was willfully ignorant of the offense | +5 |
| (g)(2) | The organization fully cooperated in the Investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | - 2 |
| **TOTAL** | | **8** |

<u>Calculation of Fine Range:</u>

| Base Fine | $481,848,850 |
|---|---|
| Multipliers | 1.6 (min)/3.2 (max) |
| Fine Range | $770,958,160 (min)/ $1,541,916,320 (max) |

6

3.    **Sentence**

Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the United States and the Defendant

agree that the appropriate disposition of this case is as set forth below and agree to

recommend jointly that the Court, at a hearing to be scheduled at an agreed-upon

time, impose it.

A.    **Relevant Considerations**

The Offices enter into this Agreement based on the individual facts and

circumstances presented by this case and the Defendant.  Among the factors

considered were the following:

(1)    Beginning on or about January 28, 2016, the Defendant began

fully cooperating with the Offices' investigation, including reporting the

conduct to the Offices, assisting and facilitating timely interviews of current

and former employees of the Defendant, promptly collecting and producing

evidence located in a foreign country along with translations, engaging in

frequent communication with the Offices about relevant facts, and providing

all non-privileged facts relating to individual involvement in the conduct

described in the Information and Statement of Facts attached hereto as

Attachment B;

(2)     the Defendant has cooperated with the National Highway Traffic and Safety Administration ("NHTSA") in connection with conducting recalls of the affected products and in undertaking other remedial measures;

(3)     the Defendant has committed to continue to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement;

(4)     the Defendant has agreed, as part of its continuing cooperation obligations, and to ensure that the Defendant implements an effective compliance program, to the appointment of an independent compliance monitor (the "Monitor") for a period of three years in accordance with Attachment D to this Agreement;

(5)     the nature and seriousness of the offense;

(6)     the Defendant's prior criminal history;

(7)     the Defendant's current financial condition;

(8)     the Defendant has agreed to continue to cooperate with the Offices in any ongoing investigation of the conduct of the Defendant and its officers, directors, employees, agents, business partners, and consultants relating to the violation to which the Defendant is pleading guilty; and

8

(9)    the Defendant's present financial condition does not enable it to both pay a guidelines fine and make restitution to its statutory victims.

**B.    Fine**

The Defendant shall pay, directly or through its affiliates or subsidiaries, to the United States a criminal fine of $25,000,000, payable in full within thirty days of entry of the plea in this case.  The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any external source with regard to the penalty, restitution, disgorgement, or any other amounts that Defendant pays pursuant to the Agreement and the Court's restitution order.  The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of this $25,000,000 fine.

**C.    Probation**

The parties agree that a term of organizational probation for a period of three years should be imposed on the Defendant pursuant to Title 18, United States Code, Sections 3551(c)(1) and 3561(c)(1).  The parties further agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraphs 5 and 6 below as well as the payment of the fine set forth in Paragraph 3(B).

9

### D.  Special Assessment

The Defendant shall pay to the Clerk of the Court for the United States

District Court for the Eastern District of Michigan the mandatory special

assessment of $400, payable in full at the time of the entry of judgment following

the sentencing hearing in this matter.

### E.  Restitution

The Defendant agrees to pay, directly or through its affiliates or subsidiaries,

$975,000,000 in restitution, as set forth below in this subparagraph.  In addition,

the parties agree to submit a joint proposed restitution order to the Court, included

with this Agreement as Attachment E.  The Defendant agrees not to seek or accept,

directly or indirectly, reimbursement or indemnification from any external source

with regard to the restitution amounts that the Defendant pays pursuant to the

Agreement and the Court's restitution order.  The Defendant further acknowledges

that no tax deduction may be sought in connection with the payment of any part of

this $975,000,000 restitution.

(1)  Restitution Under 18 U.S.C. § 3663A.  The Defendant agrees,

pursuant to Title 18, United States Code, Section 3663A(a), to pay

$481,848,850 to the victims of the defendant's fraud scheme, that is, those

auto manufacturers who were defrauded in connection with their purchase of

10

Takata airbag systems utilizing non-compliant ammonium nitrate-based inflators ("the victim auto manufacturers") based on the provision of materially false, fraudulent, and misleading documents, data, and information, or a failure to provide material information.

(2)  <u>Additional Restitution.</u>  The Defendant agrees, pursuant to Title 18, United States Code, Section 3663(a)(3), to pay:

    i.  $125,000,000 in additional restitution to recompense individuals who suffered (or will suffer) personal injury caused by the malfunction of a Takata phase-stabilized ammonium nitrate ("PSAN") airbag inflator; and

    ii.  $368,151,150 in additional restitution to all auto manufacturers that purchased airbags with PSAN inflators from Takata or any of its subsidiaries, regardless of location.

(3)  <u>Timing.</u>  The Defendant agrees that it will make the restitution payments on the following schedule:

    i.  The $481,848,850 in restitution set forth in Paragraph 3(E)(1) will be paid in full by the Defendant within five days after the closing of the currently anticipated sale, merger, acquisition, or combination involving a transfer of control of the Defendant,

11

which must occur within 365 days after entry of the plea in this case;

ii. The $368,151,150 in additional restitution set forth in Paragraph 3(E)(2)(ii) will be paid in full by the Defendant within five days after the closing of the currently anticipated sale, merger, acquisition, or combination involving a transfer or control of the Defendant, which must occur within 365 days after entry of the plea in this case; and

iii. The $125,000,000 in additional restitution set forth in Paragraph 3(E)(2)(i) will be paid in full by the Defendant within thirty days of entry of the plea in this case. The parties agree that upon the later of: (a) five years after entry of the plea in this case (the time currently estimated by the Defendant for the recall of its defective products to be completed); or (b) the date upon which such recall is complete, any funds remaining of the $125,000,000 in restitution monies provided for in this paragraph shall be paid to the United States. The Defendant agrees not to contest the payment of these monies to the United States.

(4)    <u>Administration of Restitution Payments.</u>  The parties agree, pursuant to Title 18, United States Code, Section 3664(d)(6), that this court has the authority to appoint a Special Master in this case.  The parties further agree that the appointment of a Special Master is appropriate and necessary to determine the proper administration and disbursement of the $975,000,000 in restitution monies the Defendant will pay in this case.  The parties therefore jointly recommend, as set forth more fully in Attachment E, that this Court appoint Kenneth Feinberg, or another appropriate and qualified person to serve as Special Master, as determined by the Court, to make findings of fact and recommendations to this Court regarding: (a) the individuals and entities who should receive restitution; and (b) the restitution amounts which these individuals and entities should receive.  The Defendant agrees to pay for all costs, fees, and expenses incurred by the Special Master.

**F.    Forfeiture**

The Defendant agrees, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), to forfeit any property, real or personal, that constitutes, or is derived from, proceeds traceable to the commission of the offenses.  The parties agree that, pursuant to Federal Rule of Criminal Procedure 32.2, a money judgment in the amount of $150,000,000 shall be

13

sufficient to satisfy the Defendant's forfeiture obligations under this Agreement. The Defendant therefore agrees to the entry of a forfeiture money judgment in the amount of $150,000,000 at the time the plea is entered in this case. The Offices agree, however, that if the Defendant fully complies with its obligations under Paragraphs 3(B) and 3(E)(2)(i) above, the Offices will not seek to enforce or collect on the money judgment.

## 4.   Other Charges

In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Offices agree that they will not file additional criminal charges against the Defendant or any of its direct or indirect affiliates, subsidiaries, or joint ventures based on (a) any of the conduct described in the Information or Attachment B, or (b) information made expressly known and specifically identified to the Offices prior to the date of this Agreement. This Paragraph does not provide any protection against prosecution for any crimes committed in the future by the Defendant or by any of its officers, directors, employees, agents or consultants, whether or not disclosed by the Defendant pursuant to the terms of this Agreement. This Agreement does not close or preclude the investigation or prosecution of any natural persons, including any officers, directors, employees, agents, or consultants of the Defendant or its direct or indirect

14

affiliates, subsidiaries, or joint ventures, who may have been involved in any of the matters set forth in the Information, Attachment B, or in any other matters. The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's excise and income tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

## 5. The Defendant's Obligations

A.     Except as otherwise provided in Paragraph 6 below in connection with the Defendant's cooperation obligations, the Defendant's obligations under the Agreement shall last and be effective for a period beginning on the date on which the Information is filed and ending three years from the later of the date on which the Information is filed or the date on which the Monitor is retained by the Defendant, as described in Paragraph 14 below (the "Term"). The Defendant agrees, however, that, in the event the Offices determine, in their sole discretion, that the Defendant has failed specifically to perform or to fulfill completely each of the Defendant's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Offices, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraph 8 below. Any extension of the Term extends all

terms of this Agreement, including the terms of the monitorship in Attachment D, for an equivalent period. Conversely, in the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the other provisions of this Agreement have been satisfied, the Term may be terminated early, except for the Defendant's cooperation obligations described in Paragraph 6 below.

     B.     The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

     (1)     to plead guilty as set forth in this Agreement;

     (2)     to abide by all sentencing stipulations contained in this Agreement;

     (3)     to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

     (4)     to commit no further crimes;

     (5)     to be truthful at all times with the Court;

     (6)     to pay the applicable fine, restitution, and special assessments;

     (7)     to cooperate with and report to the Offices as provided in

Paragraph 6;

(8)     to continue to implement a compliance and ethics program designed to prevent and detect fraudulent conduct throughout its operations, including but not limited to the minimum elements set forth in Attachment C of this Agreement; and

(9)     to retain an independent compliance monitor for a term of three years in accordance with Attachment D of this Agreement.

C.     The Defendant agrees that it will not attempt to delay, forestall, or avoid payment of the criminal fine, restitution, and/or forfeiture in this case.

## 6.   The Defendant's Cooperation and Reporting Obligations

A.     The Defendant shall cooperate fully with the Offices in any and all matters relating to the conduct described in the Information, this Agreement, and Attachment B, subject to clearly applicable law and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Offices, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Defendant, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any

17

and all matters relating to the conduct described in the Information, this Agreement, and Attachment B. The Defendant agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

    (1)    The Defendant shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or attorney work product doctrine with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Defendant.

    (2)    Upon request of the Offices, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described in Paragraph 6(A)(1) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

(3)     The Defendant shall use best efforts to make available, for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities.  Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

(4)     With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Defendant consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Offices, in their sole discretion, shall deem appropriate.

B.     In addition to the obligations in Paragraph 6(A), during the Term, should the Defendant learn of any evidence or allegation of a violation of U.S. federal law, the Defendant shall promptly report such evidence or allegation to the

19

Offices. Thirty days prior to the end of the Term, the Defendant, by the Chief

Executive Officer of the Defendant and the Chief Financial Officer of the

Defendant, will certify to the Offices that the Defendant has met its disclosure

obligations pursuant to this Paragraph. Each certification will be deemed a

material statement and representation by the Defendant to the executive branch of

the United States for purposes of Title 18, United States Code, Section 1001, and

it will be deemed to have been made in the judicial district in which this

Agreement is filed.

## 7.  Waiver of Appellate and Other Rights

A.     The Defendant understands that by entering into this agreement, the

Defendant surrenders certain rights as provided in this agreement.  The Defendant

understands that the rights of criminal defendants include the following:

> (1)    the right to plead not guilty and to persist in that plea;

> (2)    the right to a jury trial;

> (3)    the right to be represented by counsel—and if necessary

have the court appoint counsel—at trial and at every other stage of the

proceedings;

> (4)    the right at trial to confront and cross-examine adverse

witnesses, to be protected from compelled self-incrimination, to testify

20

and present evidence, and to compel the attendance of witnesses; and

(5)     pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

B.     Nonetheless, the Defendant knowingly waives the right to appeal the conviction and any sentence within the statutory maximum described above (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the United States in this plea agreement.  This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b).  The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a.  The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in Attachment B or the Information, including any prosecution that is not time-barred on the date that this Agreement is signed in the

21

event that: (a) the conviction is later vacated for any reason; (b) the Defendant

violates this Agreement; or (c) the plea is later withdrawn, provided such

prosecution is brought within one year of any such vacation of conviction, violation

of agreement, or withdrawal of plea plus the remaining time period of the statute of

limitations as of the date that this Agreement is signed.  The Offices are free to take

any position on appeal or any other post-judgment matter.  The parties agree that

any challenge to the Defendant's sentence that is not foreclosed by this Paragraph

will be limited to that portion of the sentencing calculation that is inconsistent with

(or not addressed by) this waiver.  Nothing in the foregoing waiver of appellate

rights shall preclude the Defendant from raising a claim of ineffective assistance of

counsel in an appropriate forum.

      C.      Federal Rule of Criminal Procedure 11(f) and Federal Rule of

Evidence 410 limit the admissibility of statements made in the course of plea

proceedings or plea discussions in both civil and criminal proceedings, if the guilty

plea is later withdrawn.  The Defendant expressly warrants that it has discussed

these rules with its counsel and understands them.  Solely to the extent set forth

below, the Defendant voluntarily waives and gives up the rights enumerated in

Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410.

Specifically, the Defendant understands and agrees that any statements that it

makes in the course of its guilty plea or in connection with the Information or this Agreement, including the Statement of Facts set forth as Attachment B to the Agreement, are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Offices have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

## 8.    Breach of Agreement

A.     If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraph 6 of this Agreement; (d) fails to implement a compliance program with an independent monitor as set forth in Paragraphs 5(B)(8) & (9) of this Agreement; or (e) otherwise fails to perform or to fulfill completely each of the Defendant's obligations under the Agreement, including the obligation to pay restitution under Paragraph 3(E) (which includes the obligation to pay restitution within the specific time frames referenced under Paragraph 3(E)), regardless of whether the Offices become aware of such a breach after the Term of the Agreement, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, federal criminal violations relating to the

conduct set forth in the Information and Attachment B, which may be pursued by

the Offices in the United States District Court for the Eastern District of Michigan

or any other appropriate venue.  Determination of whether the Defendant has

breached the Agreement and whether to pursue prosecution of the Defendant shall

be in the Offices' sole discretion.  Any such prosecution may be premised on

information provided by the Defendant.  Any such prosecution relating to the

conduct described in the attached Statement of Facts or relating to conduct known to

the Offices prior to the date on which this Agreement was signed that is not time-

barred by the applicable statute of limitations on the date of the signing of this

Agreement may be commenced against the Defendant, notwithstanding the

expiration of the statute of limitations, between the signing of this Agreement and

the expiration of the Term of the Agreement plus one year.  Thus, by signing this

Agreement, the Defendant agrees that the statute of limitations with respect to any

such prosecution that is not time-barred on the date of the signing of this Agreement

shall be tolled for the Term of the Agreement plus one year.  The Defendant gives

up all defenses based on the statute of limitations, any claim of pre-indictment

delay, or any speedy trial claim with respect to any such prosecution or action,

except to the extent that such defenses existed as of the date of the signing of this

Agreement.  In addition, the Defendant agrees that the statute of limitations as to

any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraph 6 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

B.      In the event the Offices determine that the Defendant has breached this Agreement, the Offices agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Defendant shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Defendant.

C.      In the event that the Offices determine that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Offices or to the Court, including the attached Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any

25

leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Offices.

D.      The Defendant acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment. The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

9.    **Parties to Plea Agreement**

A.    The Defendant understands and agrees that this Agreement is between the Offices and the Defendant and does not bind any other division or section of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority. Nevertheless, the Offices will bring this Agreement and the nature and quality of the conduct, cooperation and remediation of the Defendant, its direct or indirect affiliates, subsidiaries, and joint ventures, to the attention of other prosecuting authorities or other agencies, as well as debarment authorities, if requested by the Defendant.

B.    The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that a resolution duly adopted by the Defendant's Board of Directors in the form attached to this Agreement as Attachment A, authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Directors, on behalf of the Defendant.

C.    The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

10.   **Change of Corporate Form**

Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the Term of the Agreement, it sells, merges, or transfers all or substantially all of its respective business operations or the business operations of its subsidiaries or affiliates involved in the conduct described in Attachment B of the Agreement attached hereto as they exist as of the date of the Agreement, whether such sale is structured as a sale, asset sale, merger , transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser to retain the commitment of the Defendant or any successor in interest thereto, to comply with the obligations described in this Agreement such that the obligations of this Agreement continue to apply to such business operations of the Defendant involved in the conduct described in Attachment B of the Agreement following the completion of the transaction. Notwithstanding the foregoing, nothing in this Paragraph 10 shall be construed as applying to assets not owned by the Defendant as of the date immediately prior to the closing of any such sale, merger, transfer or other change in corporate form. Except as may otherwise be agreed by the parties hereto in connection with a particular transaction, if, during the Term of the Agreement, the

28

Defendant undertakes any change in corporate form that involves business operations that are material to their consolidated operations or to the operations of any subsidiaries or any affiliates involved in the conduct described in Attachment B of the Agreement attached hereto, whether such transaction is structured as a sale, asset sale, merger, transfer , or other change in corporate form, the Defendant shall provide notice to the Offices at least thirty days prior to undertaking any such change in corporate form. If such transaction (or series of transactions) has the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Offices, it shall be deemed a breach of this Agreement.

## 11.    Failure of Court to Accept Agreement

This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C).  The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of

this Agreement, neither party shall be bound by the provisions of the Agreement.

## 12.    Presentence Report

The Defendant and the Offices waive the preparation of a Presentence Investigation Report. The Defendant understands that the decision whether to proceed with the sentencing proceeding without a Presentence Investigation Report is exclusively that of the Court. In the event the Court directs the preparation of a Presentence Investigation Report, the Offices will fully inform the preparer of the Presentence Investigation Report and the Court of the facts and law related to the Defendant's case. At the time of the plea hearing, the parties will suggest mutually agreeable and convenient dates for the sentencing.

## 13.    Public Statements by the Defendant

A.    The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and Attachment B. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraph 8 of this Agreement. The decision

30

whether any public statement by any such person contradicting a fact contained in

the Information or Attachment B will be imputed to the Defendant for the purpose

of determining whether it has breached this Agreement shall be at the sole discretion

of the Offices.  If the Offices determine that a public statement by any such person

contradicts in whole or in part a statement contained in the Information or

Attachment B, the Offices shall so notify the Defendant, and the Defendant may

avoid a breach of this Agreement by publicly repudiating such statement(s) within

five business days after notification.  The Defendant shall be permitted to raise

defenses and to assert affirmative claims in other proceedings relating to the matters

set forth in the Information and Attachment B provided that such defenses and

claims do not contradict, in whole or in part, a statement contained in the

Information or Attachment B.  This Paragraph does not apply to any statement made

by any present or former officer, director, employee, or agent of the Defendant in

the course of any criminal, regulatory, or civil case initiated against such individual,

unless such individual is speaking on behalf of the Defendant.

B.      The Defendant agrees that if it or any of its direct or indirect

subsidiaries or affiliates issues a press release or holds any press conference in

connection with this Agreement, the Defendant shall first consult the Offices to

determine (a) whether the text of the release or proposed statements at the press

conference are true and accurate with respect to matters between the Offices
and the Defendant; and (b) whether the Offices have any objection to the release
or statement.

**14.     Independent Compliance Monitor**

A.     Promptly after the Offices' selection pursuant to Paragraph 14(B)
below, the Defendant agrees to retain the Monitor for the term specified in
Paragraph 14(C). The Monitor's duties and authority, and the obligations of the
Defendant with respect to the Monitor and the Offices, are set forth in Attachment
D, which is incorporated by reference into this Agreement. Within thirty calendar
days after the execution of this Agreement, and after consultation with the
Department, the Defendant will propose to the Offices a pool of three qualified
candidates to serve as the Monitor. If the Department determines, in its sole
discretion, that any of the candidates are not, in fact, qualified to serve as the
Monitor, or if the Department, in its sole discretion, is not satisfied with the
candidates proposed, the Department reserves the right to seek additional
nominations from the Defendant. The parties will endeavor to complete the monitor
selection process within sixty days of the execution of this agreement. The Monitor
candidates or their team members shall have, at a minimum, the following
qualifications:

32

(1)     demonstrated expertise with respect to federal anti-fraud laws, including experience counseling on these issues;

(2)     experience designing and/or reviewing corporate ethics and compliance programs, including anti-fraud policies, procedures and internal controls;

(3)     knowledge of automotive or similar industries;

(4)     the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

(5)     sufficient independence from the Defendant to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

B.     The Offices retain the right, in their sole discretion, to choose the Monitor from among the candidates proposed by the Defendant, though the Defendant may express its preference(s) among the candidates.  In the event the Offices reject all proposed Monitors, the Defendant shall propose an additional three candidates within twenty business days after receiving notice of the rejection. This process shall continue until a Monitor acceptable to both parties is chosen. The Offices and the Defendant will use their best efforts to complete the selection process within sixty calendar days of the execution of this Agreement.  If, during

33

the term of the monitorship, the Monitor becomes unable to perform his or her obligations as set out herein and in Attachment D, or if the Offices in their sole discretion determine that the Monitor cannot fulfill such obligations to the satisfaction of the Offices, the Offices shall notify the Defendant of the release of the Monitor, and the Defendant shall within thirty calendar days of such notice recommend a pool of three qualified Monitor candidates from which the Offices will choose a replacement. The Monitor will be required to provide monthly invoices of its fees and expenses, accompanied by a reasonably detailed description of time expended.

C. The Monitor's term shall be three years from the date on which the Monitor is retained by the Defendant, subject to extension or early termination as described in Paragraph 5. The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D. The Defendant agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires. Nor will the Defendant discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Monitor's term.

34

**15.    Complete Agreement**

This document states the full extent of the Agreement between the parties. There are no other promises or agreements, express or implied.  Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR TAKATA CORPORATION:**

Date: 1 / 13 / 2017

By: _____

Shigehisa Takada
Chairman of the Board of Directors
Takata Corp.

Date: 1|12|17

By: _____

Lanny A. Breuer
Daniel Suleiman
Covington & Burling LLP
Counsel for Takata Corp.

Date: 1|12|17

By: _____

Andrew J. Levander
Hector Gonzalez
Mauricio A. España
Dechert LLP
Counsel for Takata Corp.

36

**FOR THE DEPARTMENT OF JUSTICE:**

ANDREW WEISSMANN
Chief, Fraud Section
Criminal Division

Date: 1│13│17

By:

Brian K. Kidd
Christopher D. Jackson
Andrew R. Tyler
  Trial Attorneys
Benjamin D. Singer
  Chief, Securities and Financial
  Fraud Unit
Robert A. Zink
  Assistant Deputy Chief, Securities
  and Financial Fraud Unit

BARBARA L. MCQUADE
United States Attorney
Eastern District of Michigan

Date: 1-13-17

By:

John K. Neal
  Chief, White Collar Crime Unit
Erin S. Shaw
Andrew J. Yahkind
  Assistant United States Attorneys

37

## ATTACHMENT A

## CERTIFICATE OF CORPORATE RESOLUTIONS

A copy of the executed Certificate of Corporate Resolutions is annexed hereto as "Attachment A."

**ATTACHMENT A**

## CERTIFICATE OF CORPORATE RESOLUTIONS
## OF THE TAKATA CORPORATION

At a duly held meeting on January 13, 2017, the Board of Directors (the "Board") of Takata Corporation (the "Company") resolved as follows:

**WHEREAS**, the Company, through its legal counsel, has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section and the U.S. Attorney's Office for the Eastern District of Michigan in connection with their investigation into potential criminal violations related to the falsification and manipulation of airbag inflator test data and information provided to the Company's customers (the "Investigation");

**WHEREAS**, both Company management and external legal counsel have reported to the Board the terms and conditions of a proposed resolution of the Investigation;

**WHEREAS**, the Board has been advised by its legal counsel of the terms of the First Superseding Information and Plea Agreement, with Attachments, as circulated to the Board (collectively the "Plea Agreement"), including, but not limited to, the payment of restitution and a criminal fine; and

**WHEREAS**, the Board acknowledges that the Plea Agreement fully sets forth the Company's agreement with the United States Department of Justice, Criminal Division, Fraud Section and the U.S. Attorney's Office for the Eastern District of Michigan with respect to criminal violations identified during the Investigation and that no additional promises or representations have been made to the Company by any officials of the United States Department of Justice, Criminal Division, Fraud Section or the U.S. Attorney's Office for the Eastern District of Michigan in connection with the disposition of the Investigation, other than those set forth in the Plea Agreement.

**THEREFORE**, this Board hereby **RESOLVES** that:

1. The Board approves and agrees to the Plea Agreement;

2. The Board approves and agrees that it is in the best interests of the Company to enter the guilty plea provided for, and agrees to the other terms provided in the Plea Agreement with the United States Department of Justice, Criminal Division, Fraud Section and the U.S. Attorney's Office for the Eastern District

of Michigan in substantially the form and substance set forth in the form of the Plea Agreement presented to this Board;

3. The directors of the Company and legal counsel for the Company are hereby each individually authorized, empowered and directed, on behalf of the Company, to execute and deliver the Plea Agreement, substantially in such form as reviewed by this Board, with such changes as such directors or legal counsel may approve;

4. The directors of the Company and legal counsel for the Company are hereby each individually authorized, empowered and directed to take any and all actions as may be necessary or appropriate, and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate to carry out and effectuate the purpose and intent of the foregoing resolution (including execution and delivery of any such agreement or document on behalf of the Company);

5. Shigehisa Takada, Chairman of the Board of Directors, or his delegate, be and hereby is authorized (i) to execute the Plea Agreement on behalf of the Company, with such modifications as he may approve, (ii) to act and speak on behalf of the Company, in any proceeding or as otherwise necessary, for the purpose of executing the Plea Agreement, including entry of a guilty plea in court on behalf of the Company, and (iii) to take further action as appears to him necessary or desirable to carry into effect the intent and purpose of the foregoing resolution; and

6. All of the actions of the directors of the Company and legal counsel for the Company, which actions would have been within the scope of and authorized by the foregoing resolution except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company; and

7. The representative directors of the Company are individually authorized, empowered or directed, to provide to the United States Department of Justice, Criminal Division, Fraud Section and the U.S. Attorney's Office for the Eastern District of Michigan a certified copy of this resolution.

I hereby certify that the above is a true and accurate copy of the resolutions of the Board of the Company passed on January 13, 2017.

January 13, 2017

Shigehisa Takada
Chairman of the Board of Directors
Takata Corporation

A-3

## ATTACHMENT B

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference as part of the Plea Agreement, dated January 13, 2017, between the United States Department of Justice, Criminal Division, Fraud Section and the U.S. Attorney's Office for the Eastern District of Michigan (the "Fraud Section and the Office") and Takata Corporation ("Takata" or the "Company"), and the parties hereby agree and stipulate that the following information is true and accurate. Takata admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Had this matter proceeded to trial, Takata acknowledges that the Fraud Section and the Office would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal First Superseding Information:

## I.

## BACKGROUND

1.     Airbag systems are vehicle safety devices that are intended to protect occupants in the event of a crash. Airbag systems contain, among other things, an inflator and an airbag. Airbag systems are designed so that, in the event of a vehicle collision, the airbag is deployed.

B-1

2.   When a collision occurs and an airbag system is deployed, a propellant inside the inflator quickly burns, generating a concentrated amount of gas. This gas is then expelled into the airbag, causing the airbag to inflate.

3.   Properly inflated airbags reduce the likelihood that a vehicle occupant will be injured or killed. In a collision, an airbag typically inflates within a fraction of a second. Improperly inflated airbags create a risk that a vehicle occupant could be injured or, in some instances, killed.

4.   As of September 1, 1998, all passenger vehicles sold in the United States were required to be equipped with front passenger and driver side airbags.

### Relevant Companies, Entities, and Individuals

5.   Takata was a Japanese company headquartered in Tokyo, Japan. Takata was engaged in the development, manufacture, and sale of airbag systems, among other things. As of 2015, Takata was the second largest supplier of airbag systems in the world, accounting for more than 20% of all airbag systems sold that year across the globe.

6.   TK Holdings Inc. ("TKH") was a subsidiary of Takata incorporated in the United States, which had its principal place of business in Auburn Hills, Michigan. TKH was primarily responsible for the development, testing, and production of airbag inflators that Takata sold in North America, including airbag inflators sold in

the United States.

7. Automobile Original Equipment Manufacturers ("OEMs") were companies that purchased airbag systems from Takata and installed them in vehicles that they manufactured and sold. OEMs typically were car manufacturers. OEMs mandated that the airbag systems purchased from Takata had to meet strict safety and performance requirements that were expressly communicated to Takata. These requirements included specific safety and performance specifications for airbag inflators.

8. From approximately 2000 through approximately 2015, three Takata executives—Executive-1, Executive-2, and Executive-3—communicated regularly with TKH regarding the design, production, and testing of airbag inflators. At different times, Executive-1, Executive-2, and Executive-3 physically worked at Takata facilities in Japan and the United States.

### Takata's Use of Ammonium Nitrate Inflators in its Airbag Systems

9. In or around the late 1990s, Takata, through TKH, began developing inflators that relied upon ammonium nitrate as their primary propellant. Ammonium nitrate was a highly combustible and unstable chemical compound. Takata, however, created and distributed in its inflators a purportedly safe and stable variation of ammonium nitrate as the propellant, called phase-stabilized ammonium nitrate

B-3

("PSAN").

10.    From in or around 2000 through in or around at least 2015, various OEMs placed orders with Takata to purchase airbag systems that contained inflators that utilized PSAN propellant. The orders placed by the OEMs to Takata generally required that the airbag systems meet certain minimum performance and safety requirements.

11.    From in or around 2000 through in or around at least 2015, Takata, through TKH, produced and sold to the OEMs hundreds of millions of driver and passenger side airbag systems containing inflators that utilized PSAN propellant.

## Takata's Production of Inflator Test Reports to the OEMs

12.    Takata utilized a standardized process to develop and test inflators. This process consisted principally of two phases: (a) a design testing phase; and (b) a production testing phase.

13.    During the design testing phase, inflators were tested by TKH and information and data generated from these tests generally was compiled by TKH. This information and data typically was provided by Takata or TKH to the OEMs in a document called a Design Validation ("DV") report.

14.    During the production testing phase, a limited number of airbag system parts, including inflators, typically were assembled on a mass production line and then

tested by TKH to ensure that they met each OEM's respective safety specifications. The information and data generated from these tests typically was provided by Takata or TKH to the OEMs in a document called a Production Validation ("PV") report. Takata's completion of a passing PV report and its delivery of a passing PV report to an OEM showing that the inflator met all of the OEM's safety and performance specifications typically was required before airbag systems could be produced, sold, and distributed by Takata to the OEMs and subsequently placed by OEMs into their vehicles.

15.     At various times, additional testing was conducted by TKH during the design testing phase and production testing phase, which generated additional information and data. This testing often was conducted by TKH to address design changes or to address identified issues or problems. The information and data that was generated from these additional tests was typically memorialized in documents called "Delta" DV or PV reports. These reports generally were provided by Takata or TKH to the OEMs.

16.     Once the inflators went into mass production, a subset of inflators from each respective inflator line typically was tested regularly by TKH to ensure production quality. This testing was referred to as lot acceptance testing ("LAT"). The information and data generated from LAT often was provided by Takata or TKH to the

OEMs.

17.    At various times throughout and following these stages, additional testing was performed by TKH. In some instances, this additional testing was performed in response to specific questions and concerns raised by particular OEMs during product development and production. In those instances, the information and data gathered was generally provided by Takata or TKH to the OEMs in reports, among other forms.

18.    At all relevant times, the OEMs used the information and data that was generated from the tests performed by TKH and communicated to the OEMs in reports, among other forms. The OEMs used this data and information when making decisions about whether to purchase certain airbag systems from Takata.

## II.

## <u>TAKATA'S FALSIFICATION OF TESTING DATA AND REPORTS</u>

19.    From in or around 2000 until in or around 2015, Takata, through its executives, employees, and agents, knowingly devised and participated in a scheme to obtain money and enrich Takata by, among other things, inducing the victim OEMs to purchase airbag systems from Takata that contained faulty, inferior, non-performing, non-conforming, or dangerous PSAN inflators by deceiving the OEMs through the submission of false and fraudulent reports and other information that

concealed the true and accurate test results for the inflators which the OEMs would not have otherwise purchased as they were.

20.     From at least in or around 2000, when Takata began to test PSAN inflators for the OEMs, Takata knew that certain PSAN inflators were not performing to the OEMs' specifications and that certain PSAN inflators had sustained failures, including ruptures, during testing.

21.     During the course of the scheme, and in internal communications, Executive-1, Executive-2, and Executive-3, separately, together, and with others, routinely discussed the fabrication of test information and data, the removal of unfavorable test information and data, and the manipulation of test information and data relating to certain PSAN inflators contracted for purchase by the OEMs. For example:

      a.     Executive-1, Executive-2, and Executive-3 commonly referred to the removal or alteration of unfavorable test data that was to be provided to Takata customers as "XX-ing" the data.

      b.     In or around February 2004, Executive-2 explained in an email to Executive-1 and others that Executive-2 was "manipulating" test data relating to a specific PSAN inflator in production for an OEM.

      c.     In or around February 2005, Executive-1 explained in an email to

B-7

Executive-2, Executive-3, and one other person that they had "no choice" but to provide manipulated data intended for distribution to a particular OEM. Executive-2 responded to the group that he, too, believed they had "no choice but to XX."

    d.    In or around March 2005, Executive-1 sent an email to Executive-2, Executive-3 and one other person indicating "XX has been done. High and low compared to the spec."

    e.    In or around April 2005, Executive-1 directed a junior engineer to "Please do XX" in an email that was also sent to Executive-2 and Executive-3.

    f.    In or around June 2005, Executive-2 explained in an email to Executive-1, Executive-3, and others, that they had no choice but to manipulate test data, and that they needed to "cross the bridge together."

22.    In order to deceive the victim OEMs and induce them to purchase certain Takata airbag systems containing faulty, inferior, non-performing, non-conforming, or dangerous PSAN inflators, Takata provided the OEMs with materially false, fraudulent, and misleading test information and data, typically contained in test reports, about the PSAN inflators. The test information and data was materially false, fraudulent, and misleading because certain test information and data provided to the OEMs by Takata relating to the PSAN inflators was fabricated,

removed, or altered (either by strategically adding, editing, or changing information and data).

23.    The false, fraudulent, and misleading test information and data (typically contained in test reports) relating to the PSAN inflators was sent by Takata to the victim OEMs in order to convince them that the PSAN inflators that they contracted to purchase from Takata were performing up to the OEMs' required specifications when, in truth and in fact, they were not.

24.    Takata provided the victim OEMs with false and misleading test information and data relating to the PSAN inflators in DV reports, PV reports, LAT data, and other reports, among other forms.

25.    The false, fraudulent, and misleading test information and data relating to the PSAN inflators that was provided to the OEMs (typically in test reports) by Takata related to various matters. Most often, the information and data related to either ballistics or effluent gas. Takata's PSAN inflators had difficulty meeting the OEMs' specifications relating to ballistics and effluent gas.

26.    Ballistic information and data is obtained based on the energy output created by the inflator during airbag deployment. This information and data is gathered, in part, to ensure the safety and efficacy of the PSAN inflator performance during airbag deployment so as not to endanger the lives of vehicle occupant(s), either

by under-pressurization—where the airbag does not inflate sufficiently to protect the occupant during a crash—or over-pressurization—where too much gas is generated too quickly, increasing the chance that the PSAN inflator will explode potentially sending shrapnel into the vehicle and potentially injuring or killing the vehicle occupant(s). Takata provided to the victim OEMs certain ballistic test information and data (typically contained in test reports) relating to PSAN inflators that was fabricated, removed, or altered (either by strategically adding, editing, or changing information and data).

27. Effluent gas information and data is generally obtained when the airbag inflator initiates. This information and data is gathered, in part, to ensure that airborne toxicity levels resulting from airbag deployment stay within specified safety parameters. Takata provided to the victim OEMs effluent gas test information and data (typically contained in test reports) relating to PSAN inflators that was fabricated, removed, or altered (either by strategically adding, editing, or changing information and data).

28. The OEMs purchased airbag systems containing faulty, inferior, non-performing, non-conforming, or dangerous PSAN inflators based, at least in part, on the false, fraudulent, and misleading test information and data (typically included in test reports) sent by Takata to the OEMs.

B-10

29.    The OEMs paid Takata for the airbag systems containing faulty, inferior, non-performing, non-conforming, or dangerous PSAN inflators by transferring funds through interstate and foreign wires from outside the Eastern District of Michigan into the Eastern District of Michigan. These funds were transferred in response to invoices that Takata sent by interstate and foreign wires to the OEMs from the Eastern District of Michigan to outside the Eastern District of Michigan. For example, on or about November 28, 2012, Takata caused to be transmitted an interstate wire transfer of $42,668.40 from Pennsylvania to Detroit, Michigan related to the purchase of airbag systems containing the aforementioned airbag inflators.

30.    The victim OEMs would not have purchased these airbag systems from Takata as they were had the true and accurate test information and data relating to the PSAN inflators been communicated and made known to them. Moreover, had the OEMs been provided with the true and accurate test information and data, the OEMs either would have: (a) insisted that any problems with the PSAN inflators be resolved prior to installation into their vehicles; or (b) refused to put the airbag systems containing the faulty or problematic PSAN inflators into their vehicles.

31.    In or around 2008, once certain airbag systems containing faulty, inferior, non-performing, non-conforming, or dangerous PSAN inflators began experiencing ruptures in the field, Executive-1, Executive-2, and Executive-3, along with others,

continued to withhold true and accurate PSAN inflator information and data from several inflator tests from the OEMs. Some of this test information and data included PSAN inflator ruptures and failures that had occurred in testing.

### The Victims

32.    Various OEMs purchased airbag systems containing faulty, inferior, non-performing, non-conforming, or dangerous PSAN inflators from Takata based on false, fraudulent, and misleading test information and data sent to the victim OEMs by Takata. As a result of the fraud scheme, the OEMs paid Takata over one billion dollars for tens of millions of Takata airbag systems containing faulty, inferior, non-performing, non-conforming, or dangerous PSAN inflators.

33.    Had the victim OEMs known the true and accurate test information and data relating to the PSAN inflators, the faulty, inferior, non-performing, non-compliant, or dangerous PSAN inflators would not have been installed in vehicles as they were. Due, at least in part, to the false and misleading test information and data relating to the PSAN inflators that was provided to the victim OEMs, the OEMs placed tens of millions of airbag systems containing faulty, inferior, non-performing, non-conforming, or dangerous PSAN inflators into tens of millions of vehicles that were sold in the United States.

## Takata Management and Compliance

34.     Prior to Takata becoming a publicly traded company in Japan in 2006, Takata had minimal internal controls and compliance systems. Beginning in approximately 2006, Takata created a senior executive compliance committee and a whistleblower hotline. Takata compliance functions failed during the course of the scheme to identify the misconduct where Takata provided the victim OEMs with materially false, fraudulent, and misleading test information and data, typically contained in test reports, about certain PSAN inflators.

35.     Takata did not recognize the warning signs relating to possible engineering misconduct, including complaints of data integrity concerns raised to senior management within TKH. Despite the fact that the efforts to falsify test data were often occurring openly over written communications and verbal discussions, were known to a number of key Takata executives in the United States and Japan, and were a consequence of widely-known failing test data and immovable production deadlines, Takata failed to identify any misconduct until 2009. Instead, during the course of the scheme, individuals who were most involved either maintained their positions or were promoted.

36.     Senior Takata executives became aware of at least some of the falsifications of testing provided to at least one OEM and a report documenting those

B-13

falsifications at least as early as 2009. Takata took no disciplinary actions against those involved until 2015.

## III.

## <u>TAKATA'S ACCOUNTABILITY</u>

37.    Takata acknowledges that the wrongful acts taken by the participating executives in furtherance of the misconduct set forth above were within the scope of their employment at Takata. Takata acknowledges that the participating employees intended, at least in part, to benefit Takata through the actions described above.

## ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with its legal and ethical obligations, Takata Corporation (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under the Plea Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains: (a) an effective system of controls designed to ensure the making, keeping, and providing to customers of fair and accurate data, reports, records, and analyses, including but not limited to design validation ("DV") reports, production validation ("PV") reports, delta DV reports, delta PV reports, and lot acceptance testing ("LAT") data; and (b) a rigorous compliance program that incorporates relevant internal controls, as well as policies and procedures designed to effectively detect and deter violations. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

C-1

*High-Level Commitment*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of its compliance code.

*Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against data falsification or inappropriate data manipulation in any form (collectively, the "data integrity policy"), which policy shall be memorialized in a written compliance code.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the data integrity policy and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the data integrity policy by personnel at all levels of the Company. These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company, including but not limited to, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business

partners"). The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the company.

4.      The Company will ensure that it has a system of internal controls reasonably designed to ensure the maintenance of fair and accurate data, reports, records, and analyses, and to ensure appropriate conduct vis-à-vis the Company's customers and government regulators. In particular, this system should be designed to provide reasonable assurances that:

a.      all data collected as part of the engineering, design, and production validation process, including but not limited to data used in compiling DV and PV reports, delta DV and PV reports, and LAT data (collectively, "test data"), is preserved in an unalterable format for at least 5 years;

b.      access to test data is permitted only in accordance with management's general or specific authorization;

c.      all test data provided to the Company's customers is true and accurate, and does not omit material data;

d.      the test data provided to customers is periodically audited in comparison with the test data originally recorded and appropriate action is taken with respect to any differences discovered;

e. all test data is gathered in accordance with the applicable test specifications, applying fair and reasonable interpretations of any required test conditions;

f. the products that are tested as part of the PV process fairly and reasonably reflect typical products being produced on the mass assembly line, and are not inappropriately engineered to produce better test data than would be expected from typical products; and

g. the Company makes immediate disclosures to its customers and government regulators regarding the safety and efficacy of its products.

*Periodic Risk-Based Review*

5. The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company, in particular the data integrity risks facing the Company, including, but not limited to, its geographical organization, interactions with various customers, industrial sectors of operation, involvement in joint venture arrangements, importance of licenses and permits in the Company's operations, and degree of governmental oversight and inspection.

6. The Company shall review its compliance policies and procedures relating to data integrity no less than annually and update them as appropriate to

ensure their continued effectiveness, taking into account relevant developments in the field and evolving international and industry standards.

### Proper Oversight and Independence

7.    The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance code, policies, and procedures relating to data integrity. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of autonomy from management as well as sufficient resources and authority to maintain such autonomy.

### Training and Guidance

8.    The Company will implement mechanisms designed to ensure that its compliance code, policies, and procedures relating to data integrity are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, positions that require such training (e.g., internal audit, sales, engineering, legal, compliance, finance), or positions that otherwise pose a risk to

the integrity of the Company's data, and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents, and business partners, certifying compliance with the training requirements.

9.     The Company will maintain, or where necessary, establish an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's compliance code, policies, and procedures relating to data integrity, including when they need advice on an urgent basis or in any jurisdiction in which the Company operates.

*Internal Reporting and Investigation*

10.     The Company will maintain, or where necessary, establish an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the Company's compliance code, policies, and procedures relating to data integrity.

11.     The Company will maintain, or where necessary, establish an effective and reliable process with sufficient resources for responding to, investigating, and

documenting allegations of violations of the Company's compliance code, policies, and procedures relating to data integrity.

### Enforcement and Discipline

12.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

13.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the Company's compliance code, policies, and procedures relating to data integrity by the Company's directors, officers, and employees.  Such procedures should be applied consistently and fairly, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program relating to data integrity is effective.

C-7

*Monitoring and Testing*

14.     The Company will conduct periodic reviews and testing of its compliance code, policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations relating to data integrity, taking into account relevant developments in the field and evolving international and industry standards.

## ATTACHMENT D

## <u>INDEPENDENT COMPLIANCE MONITOR</u>

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Takata Corporation (the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Eastern District of Michigan (the "Fraud Section and the Office"), are as described below:

1.     The Company will retain the Monitor for a period of three years (the "Term of the Monitorship"), as provided by Paragraph 14 of the Plea Agreement (the "Agreement"). The Company will select a Monitor agreeable to the Fraud Section and the Office by the date on which the Court enters judgment in this matter.

### *Monitor's Mandate*

2.     The Monitor's primary responsibility is to assess and monitor the Company's compliance with its legal and ethical obligations, including those set forth in the Corporate Compliance Program in Attachment C, so as to specifically address and reduce the risk of any recurrence of the Company's misconduct. During the Term of the Monitorship, the Monitor will review and provide recommendations for improving the Company's design, implementation, and enforcement of its compliance and ethics programs for the purpose of preventing future criminal and

ethical violations by the Company and its subsidiaries, including, but not limited to, violations related to the conduct giving rise to the Agreement and criminal First Superseding Information filed in connection with this matter (the "Mandate"). This Mandate shall include an assessment of the Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement.

*Company's Obligations*

3.     The Company shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Company's compliance program in accordance with the principles set forth herein and applicable law, including applicable data protection and labor laws and regulations. To that end, the Company shall: facilitate the Monitor's access to the Company's documents and resources; not limit such access, except as provided in Paragraphs 5–6; and provide guidance on applicable local law (such as relevant data protection and labor laws). The Company shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate. The Company shall use its best efforts to provide the Monitor with access to the Company's former employees and its third-party vendors, agents, and consultants.

4.     Any disclosure by the Company to the Monitor concerning fraudulent or criminal conduct shall not relieve the Company of any otherwise applicable obligation to truthfully disclose such matters to the Fraud Section and the Office.

*Withholding Access*

5.     The parties agree that no attorney-client relationship shall be formed between the Company and the Monitor.  In the event that the Company seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Company that may be subject to a claim of attorney-client privilege or to the attorney work-product doctrine, or where the Company reasonably believes production would otherwise be inconsistent with applicable law, the Company shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.     If the matter cannot be resolved, at the request of the Monitor, the Company shall promptly provide written notice to the Monitor and the Fraud Section and the Office.  Such notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access.  The Fraud Section and the Office may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the*
*Company and Review Methodology*

7.  In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Company personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Company's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Company, as well as the Company's internal resources (e.g., legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Company-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.  The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by the Company's (a) organizational structure, (b) training programs, (c) compensation and incentive structures, (d) internal auditing processes, (e) internal investigation procedures, and (f) reporting mechanisms.

9.  In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Company's current policies and procedures; (b) on-site

D-4

observation of selected systems and procedures of the Company at sample sites, including internal controls, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Company's compliance program.

*Monitor's Written Work Plans*

10.     To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least two follow-up reviews and reports as described in Paragraphs 16–19 below. With respect to the initial report, after consultation with the Company and the Fraud Section and the Office, the Monitor shall prepare the first written work plan within sixty calendar days of being retained, and the Company and the Fraud Section and the Office shall provide comments within thirty calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the Fraud Section and the Office, the Monitor shall prepare a written work plan at least thirty calendar days prior to commencing a review, and the Company and the Fraud Section and the Office shall provide comments within twenty calendar days after receipt of the written work plan. Any disputes between

the Company and the Monitor with respect to any written work plan shall be decided by the Fraud Section and the Office in their sole discretion.

11. All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement. In developing such understanding the Monitor is to rely, to the extent possible, on available information and documents provided by the Company. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

12. The initial review shall commence no later than one hundred and twenty calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor, and the Fraud Section and the Office). The Monitor shall issue a written report within one hundred and fifty calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the

effectiveness of the Company's compliance program. The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Company prior to finalizing them. The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention. The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to the Deputy Chief – SFF Unit, Fraud Section, Criminal Division, U.S. Department of Justice, at 1400 New York Avenue, N.W., Bond Building, Washington, D.C. 20005 and the Chief – White Collar Crime Unit, U.S. Attorney's Office for the Eastern District of Michigan, at 211 W. Fort Street, Suite 2001, Detroit, MI 48226. After consultation with the Company, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the Fraud Section and the Office.

13.    Within one hundred and fifty calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report, unless, within sixty calendar days of receiving the

report, the Company notifies in writing the Monitor and the Fraud Section and the Office of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred and fifty calendar days of receiving the report but shall propose in writing to the Monitor and the Fraud Section and the Office an alternative policy, procedure or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five calendar days after the Company serves the written notice.

14.    In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).

15.    With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred and fifty calendar days after

receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

*Follow-Up Reviews*

16.    A follow-up review shall commence no later than one hundred and eighty calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor and the Fraud Section and the Office).  The Monitor shall issue a written follow-up report within one hundred and twenty calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the initial review.  After consultation with the Company, the Monitor may extend the time period for issuance of the follow-up report for a brief period of time with prior written approval of the Fraud Section and the Office.

17.    Within one hundred and twenty calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within thirty calendar days after receiving the report, the Company notifies in writing the Monitor and the Fraud Section and the Office concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within the one hundred and twenty

calendar days of receiving the report but shall propose in writing to the Monitor and

the Fraud Section and the Office an alternative policy, procedure, or system designed

to achieve the same objective or purpose.  As to any recommendation on which the

Company and the Monitor do not agree, such parties shall attempt in good faith to

reach an agreement within thirty calendar days after the Company serves the written

notice.

18.    In the event the Company and the Monitor are unable to agree on an

acceptable alternative proposal, the Company shall promptly consult with the Fraud

Section and the Office.   The Fraud Section and the Office may consider the

Monitor's  recommendation  and  the  Company's  reasons  for  not adopting  the

recommendation in determining whether the Company has fully complied with its

obligations under the Agreement.  Pending such determination, the Company shall

not be required to implement any contested recommendation(s).  With respect to any

recommendation that the Monitor determines cannot reasonably be implemented

within one hundred and twenty calendar days after receiving the report, the Monitor

may extend the time period for implementation with prior written approval of the

Fraud Section and the Office.

19.    The Monitor shall undertake a second follow-up review not later than

one hundred and fifty calendar days after the issuance of the first follow-up report.

The Monitor shall issue a second follow-up report within one hundred and twenty

days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16–18. Following the second follow-up review, the Monitor shall certify whether the Company's compliance program, including its policies and procedures, is reasonably designed and implemented to prevent and detect violations of the federal fraud statutes. The final follow-up review and report shall be completed and delivered to the Fraud Section and the Office no later than thirty days before the end of the Term.

*Monitor's Discovery of Potential or Actual Misconduct*

20.     (a)     Except as set forth below in sub-paragraphs (b), (c) and (d), should the Monitor discover during the course of his or her engagement any potentially fraudulent or unethical conduct in relation to the design, engineering, testing, or manufacturing of the Company's automotive safety-related products (collectively, "Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Company's General Counsel, Chief Compliance Officer, and/or Audit Committee for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Fraud Section and the Office at any time, and shall report Potential Misconduct to the Fraud Section and the Office when they request the information.

(b)     In some instances, the Monitor should immediately report Potential Misconduct directly to the Fraud Section and the Office and not to the

Company. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Fraud Section and the Office and not to the Company, namely, where the Potential Misconduct: (1) poses a risk to public health or safety or the environment; (2) involves senior management of the Company; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)     If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Fraud Section and the Office.  When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Fraud Section and the Office, and, in such cases, disclosure of the Actual Misconduct to the General Counsel, Chief Compliance Officer, and/or the Audit Committee of the Company should occur as the Fraud Section and the Office and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Fraud Section and the Office or not.  Further, if the Company or any entity or person working directly or indirectly for or on behalf of the Company withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such

withholding is without just cause, the Monitor shall also immediately disclose that fact to the Fraud Section and the Office and address the Company's failure to disclose the necessary information in his or her reports.

(e)     The Company nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

21.     The Monitor shall meet with the Fraud Section and the Office within thirty calendar days after providing each report to the Fraud Section and the Office to discuss the report, to be followed by a meeting between the Fraud Section and the Office, the Monitor, and the Company.

22.     At least annually, and more frequently if appropriate, representatives from the Company and the Fraud Section and the Office will meet together to discuss the monitorship and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Fraud Section and the Office, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.     The reports will likely include proprietary, financial, confidential, and competitive business information.  Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations

and thus undermine the objectives of the monitorship.  For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section and the Office determine in their sole discretion that disclosure would be in furtherance of the Fraud Section and the Office's discharge of their duties and responsibilities or is otherwise required by law.